UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED
2016 DEC 12 PM 12 59
U.S. DISTRICT COURT
NEW HAVEN, CT.

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 03:MJ: 16mj716 (SALM) 16mj715 (SALM) 16mj714 (SALM) |
| v. | **Filed Under Seal** |
| MUHAMMAD IMRAN KHAN<br>MUHAMMAD KAMRAN KHAN<br>MUHAMMAD ISMAIL KHAN | December 12, 2016 |

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANT**

I, Brian D'Ambrosio, being duly sworn, depose and state as follows:

1. I have been employed as a Special Agent for the United States Department of Defense, Defense Criminal Investigative Service ("DCIS"), since 2008. I am presently assigned to the DCIS Resident Agency in New Haven, Connecticut. Since joining DCIS, I have been involved in investigations related to the theft and diversion of military equipment, as well as the illegal export of controlled items without a license. I have gained expertise in the conduct of such investigations through training in seminars, classes, and everyday work related to conducting these types of investigations. During the course of my career with DCIS I have participated in the execution of numerous search warrants for physical premises and arrests.

2. I subscribe this affidavit in support of a Complaint and Application for an Arrest Warrant authorizing the arrest of Muhammad Imran Khan ("IMRAN"), Muhammad Kamran Khan ("KAMRAN") and Muhammad Ismail Khan ("ISMAIL"), all residents of Connecticut, for violations of 50 U.S.C. § 1705(c) (illegal exports); 18 U.S.C § 554 (smuggling of goods from the United States); 18 U.S.C. § 1956(a)(2)(A) (money laundering); and 18 U.S.C. § 1001 (false statements).

BD (S)

3. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent authorized to enforce criminal laws and duly authorized by the Attorney General to request an arrest warrant. I am one of the officers involved in the investigation that is the subject of this affidavit and have personally participated in the investigation concerning the violations of the federal laws listed herein.

4. The statements contained in this affidavit are based on: (1) my personal participation in the investigation; (2) information provided by federal law enforcement agents employed by DCIS, the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), the United States Customs and Border Protection Service ("CBP"), U.S. Postal Inspection Service and the Federal Bureau of Investigation ("FBI"); (3) witness statements; (4) public information and law enforcement databases; and (5) my experience and training. Unless otherwise indicated, all conversations and statements described in this affidavit are related in substance and in part except where placed in quotation marks.

5. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of arrest warrants, I have not included each and every fact known to me regarding this investigation. Rather, I have set forth only those facts that I believe are sufficient to establish probable cause.

**RELEVANT STATUTES**

6. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of federal criminal laws have been committed, including the following statutes.

*Illegal Exports - IEEPA*

7. Under the International Emergency Economic Powers Act ("IEEPA"), the

President is granted the authority to deal with unusual and extraordinary threats to the national security, foreign policy, and economy of the United States. Under IEEPA, the President can declare a national emergency through executive orders that have the full force and effect of law.

8. Pursuant to IEEPA, on August 17, 2001, the President issued Executive Order 13,222, which declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy and economy of the United States in light of the expiration of the Export Administration Act, 50 App. U.S.C. §§ 2401-2420, which lapsed on August 17, 2001. 66 Fed. Reg. 44,025 (Aug. 22, 2001). While in effect, the EAA regulated the export of goods, technology, and software from the United States. Pursuant to the provisions of the EAA, the Department of Commerce ("DOC")'s Bureau of Industry and Security ("BIS") promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, which contained restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA. See 15 C.F.R. § 730.2. In Executive Order 13,222, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have issued annual Executive Notices extending the national emergency declared in Executive Order 13,222 from the time period covered by that Executive Order through the present. See, e.g., 81 Fed. Reg. 52,587 (Aug. 8, 2016).

9. Pursuant to its authority derived from IEEPA, the DOC reviews and controls the export of certain goods and technologies from the United States to foreign countries. In particular, the DOC has placed restrictions on the export of goods and technologies that it has determined could make a significant contribution to the military potential or nuclear proliferation

of other nations or that could be detrimental to the foreign policy or national security of the United States.

10. The EAR contain a list of names of certain foreign persons – including businesses, research institutions, government and private organizations, individuals, and other types of legal persons – that are subject to specific license requirements for the export, re-export and/or in-country transfer of specified items. These persons comprise the DOC's "Entity List," which is found at Title 15, Code of Federal Regulations, Part 744, Supplement No. 4. The DOC first published the Entity List in February 1997 as part of its efforts to inform the public of entities who have engaged in activities that could result in an increased risk of the diversion to weapons of mass destruction ("WMD") programs of items exported, re-exported, and transferred (in-country). Since its initial publication, grounds for inclusion on the Entity List have expanded to include activities sanctioned by the U.S. State Department and activities contrary to U.S. national security and/or foreign policy interests.

11. On an individual basis, the persons on the Entity List are subject to export licensing requirements and policies supplemental to those found elsewhere in the EAR. On November 19, 1998, the DOC added the Pakistan Atomic Energy Commission ("PAEC"), the Space & Upper Atmosphere Research Commission ("SUPARCO"), and the National Institute of Lasers & Optronics ("NILOP") to the Entity List, and each has remained on the list at all times relevant to this affidavit. Accordingly, at all times relevant to this affidavit, a license was required from the DOC for all exports to PAEC, SUPARCO, and NILOP of all items subject to the EAR. No license exception may be used to export, re-export, or transfer (in-country) to such entities unless specially authorized on the Entity List.



BO

12. Under IEEPA and the EAR, it is a crime to willfully export, or attempt or conspire to export, from the United States, any item requiring an export license without first obtaining the license from the DOC. *See* 50 U.S.C. § 1705(c) and 15 C.F.R. § 764.2.

*Smuggling Goods from United States*

13. The export smuggling statute, 18 U.S.C § 554, provides in pertinent part as follows:

> (a) . . . Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, . . . or in any manner facilitates the transportation, . . . of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined under this title, imprisoned not more than 10 years, or both.

As set forth in the export smuggling statute, an actual or attempted export violates that statute if it is attempted or conducted in a manner "contrary to any law or regulation of the United States. Two such laws or regulations are pertinent to this case. First is 13 U.S.C. § 305, which prescribes penalties for "unlawful export information activities," and which states in pertinent part:

> (1) . . . Any person who knowingly fails to file . . . export information through . . . the Automated Export System (AES) shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both.

Export controlled military or "dual-use" equipment is among the items for which AES filings are required. Second, Part (a)(4) of 15 C.F.R. § 30.2, captioned "General requirements for filing Electronic Export Information (EEI)," makes clear that export information must be filed as to all equipment for which an export license is required under either the Department of Commerce Bureau of Industry and Security ("BIS") regulations, 15 C.F.R. § 730-774, or the Department of State International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120 through 130, as



BD

well as for any item that is"[s]ubject to the ITAR, but exempt from license requirements."

*Money Laundering*

14. Violations of the IEEPA are among those listed as predicate offenses for money laundering violations. *See* 18 U.S.C. § 1956(c)(7)(D). Thus, financial transactions arising from export violations may constitute an offense under Section 1956 or 1957. Section 1956(a)(2)(A), for example, prohibits the transportation, transmission or transfer of funds to a place in the United States, from or through a place outside the United States (and vice versa), with the intent to promote the carrying on of a specified unlawful activity. Funds transferred into the United States as payment for purchases of controlled U.S. goods; therefore, would be encompassed by Section 1956.

*False Statements*

15. When false statements are made in export cases, those statements often appear in export information that is submitted via the Automated Export System ("AES"), on predecessor documents called Shipper's Export Declarations ("SEDs"). In such documents, the exporter is required to specifically describe the items to be exported, the country of ultimate destination, and the value of the shipment. If a false statement is made in shipping documents, the offense may be charged as a violation of Title 18, United States Code, Section 1001, or as a violation of pertinent export provisions. *See, e.g.,* 22 U.S.C. § 2778(c) (A); *see also* 13 U.S.C. § 305 ("[a]ny person who knowingly fails to file or knowingly submits false or misleading export information through the Shippers Export Declaration (SED) (or any successor document) or the Automated Export System (AES) shall be [guilty of a crime].").

16. Federal law enforcement agents are investigating IMRAN, doing business as

"Brush Locker Tools Division," "Cerda Market" and "Kauser Enterprises USA LLC"; KAMRAN, doing business as "Kauser Enterprises"; ISMAIL and [redacted] for the illegal exports of dual use items without a license to Pakistan, specifically, to PAEC, SUPARCO and NILOP.

## THE DEFENDANTS

17. MUHAMMAD IMRAN KHAN ("IMRAN") is believed to reside at [redacted], North Haven, Connecticut. According to records provided by CBP, IMRAN was naturalized on or about July 28, 2000. According to the State of Connecticut, Commercial Records Division, IMRAN is the owner and sole proprietor of Cerda Market, a small convenience store located at 209 Shelton Avenue, New Haven, Connecticut.

18. MUHAMMAD KAMRAN KHAN ("KAMRAN") is believed to reside at [redacted] Hamden, Connecticut. According to records provided by CBP, KAMRAN is a legal permanent resident who immigrated to the United States from Pakistan on or about March 3, 2011. From in or about February 2014 to in or about February 2016, KAMRAN resided at [redacted] Meriden, Connecticut.

19. MUHAMMAD ISMAIL KHAN ("ISMAIL"), is believed to reside at [redacted] Meriden, Connecticut. According to records provided by CBP, ISMAIL is a legal permanent resident who immigrated on or about January 30, 2002, from Pakistan. According his visa application filed on or about January 30, 2002, ISMAIL is the father of IMRAN and KAMRAN. Since in or about April 2014, ISMAIL has resided at [redacted] Meriden, Connecticut.

## BUSINESSES ASSOCIATED WITH IMRAN AND KAMRAN

20. Cerda Market, LLC ("Cerda Market"), New Haven, CT, is a domestic Limited Liability Company registered on June 30, 2006, with a business and mailing address of 209 Shelton Avenue, New Haven, CT 06473. IMRAN is listed as the principal for Cerda Market, with a business address of 209 Shelton Avenue, New Haven, CT, 06511 and a residential address 925 Mix Avenue, Apt. T-2, Hamden, CT. IMRAN is also listed as the agent for Cerda Market with a business address of 209 Shelton Avenue, New Haven, CT, 06511 and a residential address of 410 Ferry Street, Apt. 3, New Haven, CT 06513. As of November 15, 2016, Cerda Market was still operating and was still registered to IMRAN.

21. Brush Locker Tools Division, LLC ("Brush Locker"), is a domestic Limited Liability Company registered on or about August 7, 2007, with a business and mailing address of 209 Shelton Avenue, New Haven, CT 06473 (the same address of Cerda Market). IMRAN is listed as one of the principals for Brush Locker, with a business address of 209 Shelton Avenue, New Haven, CT 06473 and a residential address of 266 Maple Avenue, North Haven, CT 06473. IMRAN is also listed as the agent for Brush Locker with a business address of 209 Shelton Avenue, New Haven, CT, 06511 and a residential address of 765 Mix Avenue, Unit F, Hamden, CT 06514.

22. North Haven Tools appears to be a business previously registered in Connecticut, with [redacted] (IMRAN's wife) as the principal, and an address of [redacted], North Haven, Connecticut (IMRAN's residence).

23. Kauser Enterprise USA, LLC. ("Kauser-USA") is a domestic Limited Liability Company registered on or about February 22, 2008, with a business and mailing address of [redacted] North Haven, CT 06473 (IMRAN's current residential address). IMRAN's wife,

[redacted], is listed as the principal for Kauser-USA, with a business and residential address of [redacted]orth Haven, CT 06473. IMRAN is listed as the agent for Kauser-USA with a business and residential address of [redacted], Hamden, CT 06514.

24. Kauser Enterprises (“Kauser-Pakistan”) is an Exporter, Importer & Manufacturer, which claims to supply mechanical parts, machine tools & general goods and is located at the following address in Pakistan: LA 6/B Block 22, F.B. (IND) Area, Karachi, Pakistan. KAMRAM is the Manager of Kauser-Pakistan.

## PROBABLE CAUSE

25. On or about June 12, 2008, your affiant received information indicating that IMRAN had been attempting to purchase “dual use” items from various manufacturers. Dual use items are articles that can have both a commercial and a military application.

26. On or about December 14, 2012, the Hon. Joan G. Margolis signed a search warrant (the “First Warrant”) authorizing the government to search information associated with two email accounts--[redacted].com,” and “[redacted]@hotmail.com,” -- both used by IMRAN.

27. On or about July 18, 2013, the Hon. Joan G. Margolis signed a second search warrant (the “Second Warrant”) authorizing the government to search information associated with eight email accounts. Specifically, “[redacted].com,” (which had been the subject of the First Warrant), “[redacted].com,” and “[redacted]@yahoo.com,” all used by IMRAN. Also [redacted]@yahoo.com,” used by KAMRAN. In addition, “[redacted]@yahoo.com” used by [redacted]; “[redacted]@yahoo.com” used by [redacted]; “[redacted]@gmail.com” used by ISMAIL; and “[redacted].com” used by FNU LNU.

28. On or about October 27, 2014, the Hon. Joan G. Margolis signed a third search warrant (the "Third Warrant") authorizing the government to search information associated with nine email accounts. Specifically, the Third Warrant again authorized the search of [redacted].com," "[redacted].com," and "[redacted]@yahoo.com," all used by IMRAN and [redacted]@yahoo.com, used by KAMRAN. It also authorized the search of [redacted].com," and "[redacted].com," used by KAMRAN. In addition, [redacted].com, used by [redacted]@yahoo.com, used by [redacted]; and [redacted]@gmail.com" used by ISMAIL.

29. Based on my review of all of the evidence obtained during the course of the investigation, there is probable cause to believe and I do believe that IMRAN, KAMRAN, ISMAIL and [redacted] ("[redacted]") are engaged in a scheme to purchase EAR licensed goods from manufacturers in the United States and abroad, and export those goods to organizations in Pakistan on the Entity List.[1]

30. In connection with this scheme, IMRAN conducts business as Brush Locker or as Kauser-USA and KAMRAN conducts business as Kauser-Pakistan. [redacted] receives tenders, that is, a request for a product, in some cases directly from agencies of the Pakistani Government and in other cases, [redacted] attempts to fill tenders that are up for public bid from the Pakistani Government. [redacted] then sends emails to KAMRAN and ISMAIL requesting them to procure specific products that are subject to the EAR. KAMRAN and/or ISMAIL then communicate the request to IMRAN. In some instances, ISMAIL will contact the U.S. manufacturer directly. In most cases, IMRAN will contact the manufacturer by telephone and/or email to purchase the

[1] [redacted], is believed to reside at [redacted] Islamabad, Pakistan. [redacted] works for [redacted] (Pvt.) Ltd. ("[redacted]"), a company committed to procuring materials and equipment for several branches of the Pakistani military.

product. If asked about the end-user, IMRAN always informs the manufacturer that the product will remain in the United States or will falsely fill out an end-user certification indicating the product will not be exported. As described more fully below, if IMRAN successfully purchases the product, the product is then shipped by the manufacturer to IMRAN at either his residence, [redacted] North Haven, CT 06473 or at Cerda Market, 209 Shelton Avenue, New Haven, CT, 06511. The products are then shipped to [redacted] at Value Additions or to Kauser-Pakistan on behalf of either PAEC, SUPARCO or NILOP. In at least one instance, IMRAN facilitated the use of UPS to get an item shipped directly from the manufacturer to Pakistan. A license was never obtained by IMRAN, KAMRAN or ISMAIL to export any item to the designated entities.

A. The August 2012 purchase from [redacted]

31. On or about August 18, 2012, [redacted], using email address "[redacted]@yahoo.com," sent KAMRAN, at email address [redacted]@yahoo.com," a request for quotation ("RFQ") for several items, including an [redacted] Alpha Duo Spectrometer.[2] In the email message, [redacted] warned: "Just don't ask these items for Pakistan. Also don't go all the Items at one time. Ask quotation partially. Act carfully (sic)."

32. On or about August 19, 2012, KAMRAN forwarded the email from [redacted] referenced in par. 31, including the warning, to IMRAN at email address "[redacted]@bltdusa.com."[3]

33. On or about August 22, 2012, IMRAN sent an RFQ to [redacted], the manufacturer of the [redacted] Alpha Duo Spectrometer, located in Oak Ridge, Tennessee.

---

[2] A spectrometer is a device used for recording and measuring spectra. An [redacted] Alpha Duo Spectrometer is a benchtop spectrometer with two alpha spectroscopy channels. Spectrometers have both commercial and military applications.

[3] Unless otherwise specified, all of the communications referenced in this Affidavit were over email.

34. On or about August 23, 2012, [redacted] provided IMRAN with a form end-user statement. The form stated, in pertinent part:

> As a supplier of commodities listed on the Commerce Control List (CCL), we are required by the U.S. Department of Commerce to comply with the Export Administration Regulations (EAR) to ensure complete compliance with the U.S. export controls.

35. According to records provided by [redacted], on or about August 27, 2012, IMRAN returned the form as the Purchasing Manager for Brush Locker, falsely identifying Brush Locker at 209 Shelton Avenue, New Haven, CT, as the end-user organization.

36. On or about August 27, 2012, [redacted] provided IMRAN with a quote for one [redacted] Alpha Duo Spectrometer, among other items, addressed to Kauser-USA at 209 Shelton Avenue in New Haven, Connecticut via email at "[redacted]@bltdusa.com."

37. On or about September 3, 2012, KAMRAN forwarded the manufacturer's quote to [redacted] via email at "[redacted]@yahoo.com."

38. Throughout September and October 2012, KAMRAN and [redacted] exchanged several email messages concerning the transaction, including an email message on or about September 26, 2012, that contained a spreadsheet detailing the transaction and potential profits. On or about September 26, 2012, KAMRAN forwarded the information concerning costs and profits in the spreadsheet to ISMAIL via email at "[redacted]@gmail.com."

39. On or about October 4, 2012, [redacted] instructed KAMRAN to proceed with the transaction, stating: "Ok go ahead and Best of Luck."

40. On or about October 9, 2012, [redacted] provided INRAM a final quote for the [redacted] Alpha Duo Spectrometer and other items in the amount of $26,331.38. This final quote ([redacted] #AK2675-4) was addressed to "Imran Khan, Brush Locker Tools Division, 209 Shelton Avenue, New Haven, CT 06511.

41. On or about October 10, 2012, IMRAN provided [redacted] a shipping address of "Brush Locker Tools Division" at 209 Shelton Avenue in New Haven, Connecticut (Cerda Market), and a billing address of [redacted] in North Haven, Connecticut (IMRAN's residence).

42. On or about November 7, 2012, KAMRAN sent an email to [redacted], attaching an invoice from "Kauser Enterprises USA LLC, 128 Spectacle Pond Road, Littleton, MA 01460 Email: [redacted]@yahoo.com [an email address associated with KANRAM]" to "Kauser Enterprises, LA 6/B Block 22, F.B (IND) Area, Karachi, Pakistan Email: [redacted].com [an email address associated with KANRAM]" in the amount of $35,549.658. The address [redacted] Littleton, Massachusetts, is the residence of [redacted] uncle of IMRAN and KANRAM.

43. On or about November 12, 2012, [redacted] emailed KANRAM indicating that $35,549.66 was being wired transfer to Kauser Enterprises USA LLC, 128 Spectacle Pond Road, Littleton, MA 01460.

44. According to records provided by [redacted], on or about December 12, 2012, the [redacted] Alpha Duo Spectrometer and related items were shipped to 209 Shelton Avenue, New Haven, Connecticut (Cerda Market).

45. On December 18, 2012, a charge of $25,661 appeared on IMRAN's American Express Business Platinum Card. The address on this account is [redacted] North Haven, CT 06473.

46. On or about December 12, 2012, a wire transfer in the amount of 35,549.66 was processed by Sanco, UAE to the order of Kauser Enterprises USA LLC at Account No. ending in 6327 at People's Bank, Hamden, CT.

47. On or about December 18, 2012, [redacted] instructed KAMRAN to send the "[redacted] shipment" to "NTS (Nano tech Solutions)" H. No. 269-B, Street No. 17, F-10/2, Islamabad, Pakistan. On December 31, 2012, KAMRAN forwarded the instructions to IMRAN.

48. On or about January 4, 2013, IMRAN provided a "spectrometer tracking #" to KAMRAN ending in 5978. KAMRAN forwarded the information to [redacted].

49. According to records provided by the United States Postal Service, the 5978 shipment was sent on January 3, 2013, from New Haven to Islamabad, Pakistan. The shipment purported to originate from "Kauser Enterprises, USA LLC at 209 Shelton Avenue in New Haven, Connecticut," although the address "925 Mix Ave. ??" was also listed in the "From" box and then crossed out. The shipment was purportedly addressed to "M/S Kauser Enterprises," but the destination address was the address provided by [redacted] for Nano Tech Solutions, that is, H. No. 269-B, Street No. 17, F-10/2, Islamabad, Pakistan. The customs declaration falsely identified the contents of the package as a portable vacuum, a surge protector, and other accessories with a total value of approximately $470.

50. On January 11, 2013, KAMRAN sent an email message to [redacted] with an attachment that appears to have been needed in order for the shipment to be delivered. Specifically, the attachment, on the letterhead of Kauser Enterprises, stated that the 5978 shipment in the name of "(M/S Kauser Enterprises H. No. 269-B, Street No. 17, F-10/2, Islamabad, Pakistan)" actually belongs to "Directorate of Technical Equipment" in Islamabad, which was "authorized" to receive the shipment on behalf of Kauser and clear it through customs.

51. According to open-source internet websites, the Directorate of Technical Equipment is a subdivision of PAEC. As stated previously, PAEC is listed on the Entity List.

According to a U.S. Department of Commerce, Bureau of Industry and Security, License Determination, a license was required to export a spectrometer to PAEC.

B. The January 2013 purchase from [redacted]

52. On or about January 2, 2013, [redacted], from email address "[redacted]@yahoo.com," sent KAMRAN, at email address "[redacted]@yahoo.com," a RFQ for Capran 980 Bagging Film.[4] KAMRAN forwarded the request to ISMAIL at "[redacted]@gmail.com" and to IMRAN at "[redacted].com."

53. On or about January 3, 2013, KAMRAN sent an email to ISMAIL with the subject header "Bagging Film." The body of the email stated, "The End user needs it urgently and can go for SPOT Purchase too. So please quote urgently. This item is to be airlifted to Karachi."[5] Also included in the email was the spreadsheet containing technical specifications of the Bagging Film.

54. On or about January 4, 2013, IMRAN sent an RFQ on the Bagging Film to [redacted] a distributor in Hampton, New Hampshire.

55. Between approximately January 7-8, 2013, IMRAN and a representative from [redacted] discussed a price for two 100-pound rolls of Bagging Film.

56. On or about January 11, 2013, KAMRAN emailed [redacted] stating that the price for one 100-pound roll of Bagging Film would be $1204.

---

[4] Capran 980 Bagging Film is a clear (low haze level) heat stabilized cast film produced from modified nylon 6 resin. It is recommended as bagging film for advanced composite fabrication and other high temperature applications where dimensional stability, adherence to sealant tapes and uniform film gage are essential. Capran 980 Bagging Film has both commercial and military applications.

[5] Based on my training and experience I believe that a "SPOT" purchase in this context means that [redacted] is authorizing the immediate purchase of the item.



30 60

57. On or about January 16, 2013, KAMRAN emailed IMRAN stating "Buy this see attached data sheet . . . [description omitted] Need 2 Roll."

58. On or about January 25, 2013, IMRAN placed an order with [redacted] for two rolls of Capran 980 Bagging Film for $1,808. In the distributor's "Sold to" and "Ship to" sections on the order confirmation was the address: Brush Locker Tools Division, USA LLC., [redacted] North Haven, CT 06473 (IMRAN's residence).

59. On February 15, 2013, a charge of $1,808 appeared on IMRAN'S American Express Business Platinum Card from [redacted]

60. Between approximately February 5-13, 2013, IMRAN arranged for the pick-up of the Bagging Film in Santa Fe Springs, CA and delivery to Pakistan via UPS Freight Forwarding.

61. On or about February 20, 2013, KAMRAM sent an email message to [redacted] with an attachment that appeared to have been needed in order for the shipment to be delivered. Specifically, the attachment, on the letterhead of Kauser Enterprises, stated that the shipment ending in 0918 "IN THE NAME OF (M/S KAUSER ENTERPRISES . . .) ACTUALLY BELONGS TO Pakistan Space & Upper Atmospheric Research Commission (SUPARCO)" in Karachi, which was "authorized" to receive the shipment. SUPARCO is on the Entity List.

62. On or about February 22, 2013, [redacted] emailed KAMRAN and stated, "I am sending you our covering letter for the bagging film to be submitted at HQ SUPARCO on Monday morning at 9:00am along with your original letter head authority."

63. On or about February 25, 2013, [redacted] emailed KAMRAN stating, "...please check the format of 2 pages, page #2 & page #3 and submit it urgently by today." Attached to the email (page 2) was a letter, on letterhead from SUPARCO, stating:



BD [handwritten initials]

"TO WHOM IT MAY CONCERN

1. It is certified that goods received against Tracking No. 3027480918 were imported by us on behalf of the National Development Centre [NDC], Islamabad.

According to the Nuclear Threat Initiative, the NDC, also known as the National Development Complex, is the focal point for Pakistan's missile development program and is credited for the redesign of several models, including the Ghaznavi and Shaheen I, II medium range ballistic missile originally developed by SUPARCO and PAEC. NDC is on the Entity List.

64. On or about February 25, 2013, KAMRAN emailed a SUPARCO representative, and carbon copied [redacted], requesting payment for the bagging film. Attached to the email was an invoice from Brush Locker Tools Division, 209 Shelton Avenue, New Haven, CT for $2,408, signed by INRAM.

65. Between March 26-27, 2013, IMRAN exchanged emails with a representative from the [redacted] regarding "Urgent problem with product." IMRAN provided test results (previously performed by SUPARCO) indicating the product did not meet specified technical parameters. The emails ceased when the representative from [redacted] asked who the end user was and who could be contacted regarding the testing. According to a U.S. Department of Commerce, Bureau of Industry and Security, License Determination, a license was required to export Capran 980 Bagging Film to SUPARCO or NDC.

66. Between approximately May 17 and June 20, 2013, KAMRAN negotiated payment for the bagging film for IMRAN with [redacted].

C. <u>The February 2013 Purchase from [redacted]</u>

67. On or about February 22, 2013, [redacted], sent KAMRAN an RFQ for two items, including twelve Narda Hybrid Couplers.[6] KAMRAN forwarded the descriptions of the requested items to ISMAIL and IMRAN.

68. From on or about February 25, 2013. through on or about April 22, 2013, ISMAIL and IMRAN sent RFQs for the hybrid couplers to various vendors.

69. On or about February 28, 2013, a vendor located in Cheyenne, Wyoming responded to ISMAIL, declining to sell the Narda hybrid couplers because "[w]e cannot export these."

70. On or about March 13, 2013, KAMRAN, from email address "[redacted]@yahoo.com," sent an email message to ISMAIL, at email address "[redacted]@gmail.com," containing an attachment named "Supply order Suparco." The attachment consists of an order for the same two items identified by [redacted], including the Narda hybrid couplers, on the letterhead of the Pakistan Space and Upper Atmosphere Research Commission (SUPARCO).

71. On or about March 14, 2013, [redacted] a distributor located in Topsfield, Massachusetts, responded to ISMAIL, quoting the hybrid couplers at $1,722 each, for a total of $18,942 for 11 hybrid couplers. The distributor also copied its response to the manufacturer of the hybrid couplers, [redacted] [redacted].

72. On or about April 12, 2013, ISMAIL forwarded the distributor's quote to IMRAN.

---

[6] A hybrid coupler is a passive device used in radio and telecommunications. It is a type of directional coupler where the input power is equally divided between two output ports. Hybrid Couplers have both commercial and military applications.

73. On or about April 30, 2013, IMRAN placed an order through [redacted] for 10 hybrid couplers, providing a shipping and billing address for "Brush Locker Tools Division" at 266 Maple Avenue in North Haven, Connecticut.

74. On or about April 30, 2013, the distributor inquired if the couplers were being exported. IMRAN falsely responded "no."

75. On or about May 1, 2013, the manufacturer sent the following email message to IMRAN, in pertinent part:

> As we discussed, I have reason to believe that these parts might be ultimately exported out of the US, due to the fact that I had several fairly recent inquiries for the same part, in the same quantity. Can you please go back to your end user (your customer in the US as you indicated) and re iterate to them that Narda is required to document any exports of our products with the country of ultimate destination, in order to comply with export regulations. This assurance from you and your customer is quite important.

76. On or about May 1, 2013, IMRAN responded: "I don't want you and me to get into any kind of trouble. Give me few days will confirm and get you the answer."

77. On or about May 6, 2013, IMRAN sent an email message to the manufacturer, falsely representing: "It is going to stay in USA." He also raises the quantity of the order to 11 couplers.

78. On or about May 13, 2013, the manufacturer sent an email message to IMRAN, requesting that IMRAN "sign and return" an attached purchase order. The "Bill To" portion of the order read: "North Haven Tools, 266 Maple Avenue, North Haven, CT 06473." The "Ship To" portion of the order read: "Brush Locker Tools Division, 209 Shelton Avenue, New Haven, CT 06511." The purchase order stated, in pertinent part:

> These items are sold strictly for use in the USA. If these items are to be exported from the United States, the party shown as the "Bill to" party on this document is responsible to determine that all applicable U.S. laws and regulations are followed.

79. On or about June 4, 2013, IMRAN forwarded the purchase order to KAMRAN. According to records provided by the manufacturer, on or about September 27, 2013, [redacted] shipped 10 units, UPS ground tracking # ending in 0120 and on October 15, 2013, shipped 1 unit, UPS ground tracking # ending in 1901. The hybrid couplers were shipped to 209 Shelton Avenue, New Haven, Connecticut (Cerda Market).

80. On or about October 29, 2013, IMRAN sent an email to KAMRAN with no subject header. The body of the email was a snapshot from DHL Express Shipments indicating a shipment on October 28, 2013, from the sorting facility, New York City Gateway (origin service area Norwalk, CT) to Karachi, Pakistan, waybill # 3572319741.

81. The DHL label reveals the shipment originated from Brush Locker Tools Division, North Haven, CT to Karachi, Pakistan. The shipment weighed one pound and the description was "cable connector and flash light."

82. On November 5, 2013, KAMRAN sent an email to [redacted] with the subject heading label "Tracking # for VAL-KD-0115 & VAL-KD-0285." The email content read: Dear Sir, NARDA 4336 [coupler model] & Cengong Course tech book dispatch by TCS. Tracking # 306012290147." On the same day, KAMRAN sent an email to [redacted], with the subject header of "narda tcs tracking." The body of the email appeared to be a screen shot of shipping detail from TCS. TCS is a courier service started in 1983 and has a strong presence in Pakistan and Middle East. The tracking number, 306012290147, indicated that on November 4, 2013, the shipment was picked up at the TCS facility in Karachi and was delivered on November 5, 2013, to Rawalpindi, Pakistan. The shipper was shown to be Kauser Enterprises and the Consignee was Value Addition PVT.



30

83. On or about November 7, 2013, KAMRAN sent an email to [redacted] with the subject heading "narda detail." The body of the email stated: $1940 * 11= $21340. Shipping with insurance =$600, Duty = $1050.

84. On or about January 21, 2014, IMRAN sent an email to ISMAIL with the subject heading of, "test result." The body of the email stated, "I have attached both packlists associated with this order. Note Certificate of Compliance on the bottom right." Attached to the email was a PDF file from [redacted] Shipping Department (shipping receipt). The receipt indicated on September 27, 2013, L3 sent Imran Khan of Brush Locker Tools Division ten (10) Hybrid Coupler Assemblies, Model 4336, S/N 01844-53.

85. A second shipping receipt indicates on October 15, 2013, the remaining one (1) Coupler Assembly. S/N 01854 was shipped for a total of eleven (11). On both receipts was the following language:

> The above commodity/technical data must be or is being exported from the United States in accordance with Export Administration regulations. Diversion contrary to U.S. law is prohibited. In accordance with U.S. law (Title 15 CFR part 746 and Supplement No.1 to part774; and Title 31 CFR), resale/re-export or transfer to certain designated countries or foreign personnel, either in the U.S.A. or abroad, is prohibited without the prior written consent of the U.S. Department of Commerce.

86. On February 26, 2014, KAMRAN sent an email to [redacted] (email account [redacted]@hotmail.com) and [redacted] with the subject header "Original Certificate." The body of the email stated," Sir, please check attached certificate." This was in reply to [redacted]'s email on February 23, 2014, stating, "Please send me the original certificate for adapter hybrid coupler as discussed." Attached to the email were two PDF's. The PDF attachments were the same L3 Communications shipping receipts IMRAN sent to KAMRAN; however, IMRAN's identity, business address, phone, email address etc. was heavily redacted. Such information,

which is discernable, indicates the Hybrid Coupler Assembly receipt was from the first shipment of ten (10) units as information on the PDF shows one (1) unit left on order.

87. According to a U.S. Department of Commerce, Bureau of Industry and Security, License Determination, a license was required to export hybrid couplers to SUPARCO.

D. The February 2013 Purchase from [redacted]

88. On or about February 15, 2013, a representative for NILOP, Isalmabad, Pakistan, Erum Mehboob, (who is personally named on the Entity List), emailed a representative for Nano Tech Solutions, Islamabad, Pakistan, with attached requests for quotes, NILOP-514 (RFQ), for Ti: Al203 (Titanium doped or "Sapphire crystals").[7]

89. On or about February 20, 2013, the Nano Tech Solutions representative sent the RFQ to [redacted], who then forwarded the NILOP-514 RFQ on to KAMRAN on the same day at email address '[redacted]@yahoo.com."

90. On or about February 20, 2013, KAMRAN sent the same NILOP-514 RFQ to IMRAN at "[redacted].com."

91. On or about February 21, 2013, KAMRAN sent an email to IMRAN and ISMAIL with the same RFQ, along with web addresses for two distributors of the crystals.

92. On or about February 20, 2013, IMRAN sent the NILOP-514 RFQ to a distributor in Lithuania.

93. Between approximately February 21- March 26, 2013, IMRAN and a representative from the Lithuanian crystal distributor negotiated prices for the NILOP-514 RFQ with delivery to the U.S.

---

[7] Titanium Crystals are crystals used for making ultra-short pulse solid state or wavelength tunable lasers. Titanium Crystals have both commercial and military applications.

94. On or about July 18, 2013, IMRAN sent an email to ISMAIL with the subject header, "payment paid." The body of the email read:

> 1) 6/25 paid $9070 for crystal paid with my line of credit will charge 1.5
>
> 2) 5/4/15 (actual date written) paid $9471 narda cad will charge 2% every month
>
> 3) $3706.83 paid 6/24 to wave line card will charge 1.5%

94. On or about July 22, 2013, KAMRAN sent an email to I-1 [redacted] stating "items ready to ship. Item in USA." Attached to the body of the email was a picture (.jpg) of an invoice from Brush Locker Tools Division. The invoice (#90038) was dated July 22, 2013, and the "Bill to" section was revealed to be National Institute of Laser & Optronics (NILOP), Islamabad, Pakistan. The invoice indicated to send payment to Brush Locker Tools Division, 209 Shelton Ave., New Haven, CT (Cerda Market). The description of the items in the invoice was shown to be the Al2O3 crystals in various lengths and the total cost of the invoice was $10,696 euros. The invoice bank information was listed as: Brush Locker Tools Division, 209 Shelton Ave., New Haven, CT. The bottom of the invoice was signed "Imran" in script.

95. Between approximately July 24, 2013, and September 2, 2013, I-1 [redacted] exchanged emails with representatives from Sanco Middle East (Sanco), Sharjah, UAE. According to Sanco's website, "Sanco Middle East provides innovative and leading edge technology and advanced instrumentation for industry, research and educational institutions across the Middle East, Asia and Africa." The emails pertained to [redacted] arranging payment to Imran/Brush Locker Tools Division for the Al2O3 crystals.

96. On or about September 11, 2013, IMRAN sent an email to KAMRAN, and cc'd [redacted] IMRAN and KAMRAN's sister, believed to be in Pakistan. The subject of the email read, "urgent crystals." The body of the email stated, "Crystals are ready for shipping.



30

62

Payment received is $13,264. It should be between $13,705 and $13,666. There is $400 missing in the exchange rate. My bank only charges $20 for wire fee. If there is a discrepancy with the exchange rate it should not be more than $50. Please check where is the remaining amount."

97. On or about October 8, 2013, KAMRAN sent an email IMRAN with the subject "Urgent dispatch today order." The body of the email read, "please send crystal today, Kauser Enterprises, House No. 269, Street No.17, Sector F-10/2, Islamabad, Cell #0333-2294824." On the same day, IMRAN replied to KAMRAN stating, "Did you receive the oxygen sensor yet. As soon ae you receive it I will dispatch the crystals."

98. On or about October 10, 2013, KAMRAN emailed [redacted] with the subject header of, "Crystal Shipping." The body of the email read, "please see DHL tracking info." Attached to the email was a ".tif" file revealing a DHL Express Worldwide shipping label. The shipper indicated the package was from Brush Locker Tools Division, I. Khan, Phone: 970-380-0162, 266 Maple Ave., North Haven, CT 06473. The "To" address was revealed to be; Kauser Enterprises, House No. 269, Street No.17, Sector F-10/2, Islamabad, Pakistan.100.

99. According to a U.S. Department of Commerce, Bureau of Industry and Security, License Determination, a license was required to export Titanium Crystals to NILOP.

**CONCLUSION**

100. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe and I do believe that violations of 50 U.S.C. § 1705(c) (illegal exports); 18 U.S.C § 554 (smuggling of goods from the United States); 18 U.S.C. § 1956(c)(7)(D) (money laundering); and 18 U.S.C. § 1001 (false statements) have been committed by MUHAMMAD IMRAN KHAN, MUHAMMAD KAMRAN KHAN and



30 60

MUHAMMAD ISMAIL KHAN. Therefore, I request that arrest warrants be issued for all three individuals for the offenses listed above.

**REQUEST FOR SEALING**

101. It is also respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this warrant and application is necessary because the items and information to be seized are relevant to an ongoing criminal investigation. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, often by posting them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Brian D'Ambrosio, Special Agent
Defense Criminal Investigative Service

Sworn and subscribed before me this 12th day of December, 2016.

/s/ Sarah A. L. Merriam, USMJ
HON. SARAH A.L. MERRIAM
UNITED STATES MAGISTRATE JUDGE